UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

WER1 WORLD NETWORK,

        Plaintiff,

        v.                                             Case No. 11-C-0901

CYBERLYNK NETWORK, INC.*,*
MICHAEL SCOTT JEWSON,
JOHN DOES 1-10,
JANE DOES 1-10,
DOE PARTNERSHIPS 1-10,
DOE CORPORATIONS 1-10,
DOE ENTITIES 1-10,

        Defendants.

DECISION DENYING MOTION FOR SUMMARY JUDGMENT (DOC. 84)
AND MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. 86)

This case involves those terms and conditions that appear on internet websites and, more particularly, what happens when the provider has kept no copy of them and the customer claims not to have seen them. Through a website, WeR1 World Network signed up for data storage with CyberLynk Network, Inc. The parties do not dispute that they had a contract by which CyberLynk provided the storage to WeR1 in exchange for money for about eleven months. Instead, they dispute what the details of the contract were, as neither party memorialized the agreement. If WeR1's version of the facts is true, CyberLynk guaranteed safe and secure storage in exchange for payment from WeR1, without detailed terms and conditions or limitations of liability. If CyberLynk's version of the facts is true, detailed terms and conditions existed (even if WeR1's representative failed to read them) and WeR1 assumed the risk of a loss of data by CyberLynk and also agreed to limit its damages for any data loss.

WeR1 did not back up or keep copies of all the materials it placed on CyberLynk's server and suffered a data loss when a recently fired CyberLynk employee, Michael Jewson, began deleting files. WeR1 filed this case alleging breach of contract and negligence against CyberLynk along with conversion and computer fraud against Jewson.[1] CyberLynk counterclaimed for breach of a contract's forum selection provision because WeR1 filed this case in Hawaii rather than in Wisconsin. (This case was transferred to the Eastern District of Wisconsin from the District of Hawaii under 28 U.S.C. § 1404(a) for the convenience of the parties.) CyberLynk has moved for summary judgment, while WeR1 has moved for partial summary judgment.

Summary judgment is proper if the depositions, documents or electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials show that there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of demonstrating it is entitled to summary judgment. *Celotex*, 477 U.S. at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend each element of its cause of action, showing that there is a genuine issue for trial. *Id.* at 322-24. In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

---

[1] By order of October 30, 2013, judgment as to liability against Jewson was granted on both claims against him, though he retains the right to litigate the amount of damages WeR1 may recover from him.

2

The mere existence of a factual dispute does not defeat a summary judgment motion; there must be a genuine issue of material fact for the case to survive. *Id.* at 247-48. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. To establish that a question of fact is "genuine," the nonmoving party must present specific and sufficient evidence that, if believed by a jury, would support a verdict in its favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249.

When both parties move for summary judgment, each is required (for its motion) to show that no genuine issues of material fact exist, taking the facts in the light most favorable to the opponent. If genuine issues of material fact exist, neither party is entitled to summary judgment. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir. 1983). That both parties move for summary judgment does not mean that a trial is unnecessary or empower the court to enter judgment as it sees fit. See 10A Charles Alan Wright et al., Federal Practice & Procedure § 2720 at 327-28 (3d ed. 1998). Cross-motions for summary judgment do not constitute a waiver of trial. See *Miller v. LeSea Broad., Inc.,* 87 F.3d 224, 230 (7th Cir. 1996). The proper procedure is to assess the merits of each summary judgment motion independently. *See Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997).

## UNDISPUTED FACTS

Plaintiff WeR1 World Network is a Hawaii-incorporated and Hawaii-based television and software production company. (Doc. 84 Statement of Undisputed Material Facts ¶ 3.[2]) Ingrid Wang is the CEO and owner of WeR1. (*Id.*) Wang formed WeR1 in 2000 to create, produce, and distribute children's educational shows. (Doc. 86 Mem. at 2.) WeR1 created and produced "Zodiac Island," a children's "edutainment" show, which used animation as well as live video and focused on the Chinese lunar calendar. (*Id.*) To develop, create and produce Zodiac Island, designers, actors, animators, creators, and others contributed from around the world, including Hong Kong, China, The Philippines, Hawaii, and California. (*Id.* at 3.)

Due to the world-wide involvement of people in the creation of Zodiac Island, Wang and Dr. Bernard Yaged, Chief Financial Officer of WeR1 in 2008, decided that WeR1 needed a safe and central storage location for its computer files, including digital, production, and animation files. (Doc. 86 Mem. at 3; Doc. 113 at 18.) WeR1 determined that it must have a central online data storage provider that would allow everyone involved in the creation of Zodiac Island to upload and access files online. (Doc. 86 Mem. at 3; Doc. 113 at 18; *see* Doc. 118 ¶ 2.)

---

[2]CyberLynk's set of proposed statements of material fact for its motion for summary judgment is found as the second attachment to that motion (Document 84). Hereafter, the court will refer to that set of facts as "Doc. 84 Statement." WeR1 responded to those proposed statements within its memorandum in response to CyberLynk's motion for summary judgment (Document 113). Those responses are referenced as "Doc. 113."

Regarding WeR1's motion for partial summary judgment, WeR1's proposed findings of fact are in its memorandum, which is an attachment to the motion (Document 86). The court will reference the memorandum as "Doc. 86 Mem." CyberLynk's responses were docketed as a stand-alone document (Document 104) and are referenced as "Doc. 104."

Unless attributed to one party alone or otherwise noted, a proposed statement of material fact referenced by the court was undisputed by the opposing party.

4

CyberLynk is a Wisconsin corporation that provides internet services from its business location in Franklin, Wisconsin. (Doc. 84 Statement ¶ 4.) Michael Jewson is a former employee of CyberLynk. (*Id.,* ¶ 5.) In 2008, CyberLynk had six employees, including Jewson. (Doc. 110, ¶ 4.)

In 2008, Yaged researched several online data storage providers that would allow WeR1 to upload and store its data electronically in one location. (Doc. 86 Mem. at 3.) After reading reviews on CyberLynk's services and reviewing CyberLynk's website, on April 12, 2008, WeR1 signed up to use CyberLynk's File Transport Protocol[3] ("FTP") hosting services (Doc. 113 at 3; *see* Doc. 118, ¶ 3; Doc. 84 Statement ¶ 6.) CyberLynk's website stated that its FTP hosting service was a "central location to store files" and that it was a "fast and secure method" of transferring files. (Doc. 86 Mem. at 4; Doc. 113 at 18.)

On April 12, 2008, WeR1 and CyberLynk entered an agreement for the provision of FTP services. (Doc. 84 Statement ¶ 6; Doc 113 at 3.) Yaged, acting on behalf of WeR1, opened a FTP hosting services account with CyberLynk by using CyberLynk's website. (Doc. 84 Statement ¶ 7.) When WeR1 signed up for CyberLynk's FTP service it had several options regarding different "packages" offered by CyberLynk. The prices of the packages varied based on number of users and storage space required. (Doc. 86 Mem. at 4; Doc. 113 at 19.)

Signing up for CyberLynk's services involved a series of web pages. (Doc. 104, ¶ 10; *see* Doc. 86 Mem. at 4 (stating that the "Alleged Agreement" was "not available on the pages where the client signs up for the service").) The registration page contained the

---

[3] At times, FTP is said to refer to "Trans*fer* Protocol." (*See* Doc. 86 Mem. at 3-4.)

following language: "By clicking the button below you agree you have read and agree to the FTP Hosting Service Subscription Agreement." (Doc. 84 Statement ¶ 16; Doc. 113 at 9.) Yaged clicked the "Complete Registration Form" button. (Doc. 84 Statement ¶ 18; Doc. 113 at 9.)

According to CyberLynk, by signing up for CyberLynk's service, WeR1 agreed to CyberLynk's FTP Hosting Service Subscription Agreement as it existed at that time (the "FTP Agreement"). (Doc. 7 Hobach Decl. ¶¶ 5-6, Ex. B; *see* Doc. 86 Mem. at 4; Doc. 104, ¶ 10.) According to Hobach, the FTP Agreement was found by clicking a hyperlink in the above-quoted statement that the customer had read just above the "Complete Registration Form" button. (Doc. 7 Hobach Decl. Ex. C (showing screenshot including above the "Complete Registration Form" button the statement: "By clicking the button below you agree you have read and agree to the FTP Hosting Service Subscription Agreement."); *see* Doc. 86 Mem. at 4; Doc. 104, ¶ 10.)

CyberLynk cannot produce a copy of the FTP Agreement in effect at the time WeR1 signed up for the FTP hosting service. (*See* Doc. 113 at 19; Doc. 118, ¶ 7.) Nor does WeR1 have any written or saved version of any contract between itself and CyberLynk. (*See* Doc. 84 Zales Decl. Ex. B at 1-2.) A copy of CyberLynk's FTP Hosting Service Subscription Agreement from August 2008 (four months after WeR1 subscribed to CyberLynk's service[4]) exists (the "August 2008 FTP form"). (*See* Doc. 113 at 19; Doc. 118, ¶ 7; Doc. 86 Mem. at 4.)

---

[4] WeR1 states that August 2008 was eight months after it subscribed to CyberLynk's services, but the court takes judicial notice that the period from April 2008 to August 2008 was four months.

6

However, according to Hobach, he placed CyberLynk's FTP Agreement on CyberLynk's website on January 1, 2006, and the FTP Agreement remained unchanged until August 2008, when two sections irrelevant to this lawsuit, sections 1(a) and 1(c), were amended or added to create the August 2008 FTP form. (Doc. 84 Hobach Aff. ¶¶ 5-7; *see* Doc. 118, ¶ 7; Doc. 104, ¶ 11.) Hobach says that he monitored his system from time to time to ensure the integrity of the information displayed and that the FTP Agreement remains as it has been since 2006 with the exception of the two irrelevant amendments. (Doc. 84 Hobach Aff. ¶¶ 6-7.)

The August 2008 FTP form provides that the "[c]ustomer is responsible for maintaining security, for maintaining patches and disaster recovery systems, and for maintaining backups." (Doc. 7 Hobach Decl. Ex. B, ¶ 6(b).) Moreover, it states:

> CYBERLYNK WILL NOT BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, EXEMPLARY, PUNITIVE, OR MULTIPLE DAMAGES, EVEN IF CYBERLYNK WAS ADVISED IN ADVANCE OF THE POSSIBILITY OF SUCH DAMAGES. CYBERLYNK'S MAXIMUM LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT WILL NOT EXCEED THE TOTAL AMOUNT OF FEES BILLED TO CUSTOMER DURING THE TWELVE (12) MONTHS PRECEDING THE CLAIM.

(*Id.,* ¶ 8(b).) In addition, the August 2008 FTP form read that the parties "consent[ed] to the personal and exclusive jurisdiction and venue of the federal and state courts of Milwaukee, Wisconsin." (*Id.,* ¶ 10(a).) Further, the August 2008 FTP form states that continued use of CyberLynk's service constitutes acceptance of any revisions to the agreement posted by CyberLynk on its website. (*Id.,* ¶ intro.)

Yaged is a sophisticated individual with an extensive background in business and computers. (Doc. 84 Statement ¶ 28.) He holds a master's degree in electrical engineering and a Ph.D. in operations research and has worked with computer systems

7

for about fifty years. (Doc. 13 Yaged Decl. ¶¶ 3, 4.) However, he had not dealt with contracts in his work before his association with WeR1. (Doc. 113 at 18; Doc. 118, ¶ 4; *see* Doc. 84 Zales Decl. Ex. A at 46-47.) According to WeR1, Yaged researched companies offering online hosting services by reviewing information and services about the various companies on the companies' websites before deciding to select CyberLynk. (Doc. 84 Statement ¶ 27.) However, Yaged did not look at the terms of service of any of the internet service providers he reviewed. (Doc. 84 Zales Decl. Ex. A at 49-50.)

Yaged swears that when he signed up for an account on CyberLynk's website on April 12, 2008, he "did not see any written agreement terms or any URL link to any written terms during the registration process." (Doc. 13 Yaged Decl. ¶ 15.) Further, he did "not recall seeing notice of any written FTP hosting agreement, nor did [he] receive any mention of any such agreement in emails sent by CyberLynk after the service was started." (*Id.*) He "did not see any provisions limiting CyberLynk's liability or exposure to damages." (*Id.*) At deposition, Yaged stated:

> Q    After you entered into the account, did you look at any agreement on the CyberLynk website dealing with FTP accounts?
> A    No.
> Q    Why not?
> A    I guess it was not – not that apparent to me where it was, if it were there, at that time I signed up.
> Q    Are you saying that there was no – there were no written terms that you had agreed to when you signed up?
> A    I can tell you that I did not see the one that I found on your website about two years later.
>     . . . .
> The one that I saw on the website, perhaps in 2010, had terms that, basically, absolved CyberLynk from almost all responsibility for the data on the – on the FTP server. And I know I had not seen that in 2008, otherwise I would not have signed up for that type of service.

8

(Doc. 84 Zales Decl. Ex. A at 51-52.)

When asked whether he had ever looked to see if there were any terms of service or an FTP hosting agreement for the CyberLynk service, Yaged testified:

> A     I do not recall anything from CyberLynk that says "You've agreed to this," or, "Here's a copy of it." Some companies do occasionally send you something that says, "Well, we've changed our user agreement, and here's what it means." I received nothing like that.
> Q     When you signed up for the account, did you believe that there was an agreement that you were agreeing to?
> A     I don't think so, no.

(*Id.* at 52.) When asked if WeR1 had a copy of the contract that it entered with CyberLynk for the FTP account, Yaged stated:

> A     I don't think there was such a contract. No, we did not have anything like that.
> Q     So you're saying there was no written contract or agreement with CyberLynk for FTP services?
> A     That's what I'm saying, yes.

(*Id.* at 55-56.) Yaged reiterated that there was no agreement in 2008 like the one he saw in 2010 when he looked at CyberLynk's website. (*Id.* at 56.) He added that he was able to enter into an agreement with CyberLynk with no written contract. (*Id.* at 58.)

Based on his review of CyberLynk's website, Yaged maintains that he formed an "understanding of the terms of the FTP Hosting Account agreement." (Doc. 84 Statement ¶ 29.) According to Yaged, the complete terms of WeR1's agreement with CyberLynk were to pay a certain amount per month for data storage, and he assumed that CyberLynk would follow basic backup and restoration policies. (Doc. 84 Zales Decl. Ex. A at 57.) However, Yaged could not recall specific terms from CyberLynk's website on which he relied when choosing CyberLynk's service. (*Id.* at 49.)

9

WeR1's expert, Thomas Goetz, testified at deposition that he had looked at FTP hosting agreements for other internet service providers for the 2008 time period. All limited liability, and a majority mentioned that backups were the responsibility of the customer. (Doc. 84 Zales Decl. Ex. C at 48-49.) CyberLynk's expert, Frank Feingold, opined that all FTP contracts, "without exception," limit liability and require customers to backup their files. (Doc. 109 Ex. 1 at 3; *see* Doc. 118, ¶ 8.) However, CyberLynk represented to at least two potential clients that it created backups of client data. (Doc. 114 Ex. A at 4, 6-7.)

Between April 2008 and March 2009, WeR1 paid CyberLynk $7,093.40 or $10,870.40 in fees for using its FTP hosting storage site. (Doc. 84 Statement ¶ 10; Doc. 86 Mem. at 5; Doc. 104, ¶ 13.) As the amount of data WeR1 was storing on CyberLynk's servers grew, WeR1's account was upgraded several times to allow WeR1 more storage capacity. When the upgrades occurred, WeR1's fees to CyberLynk increased. (Doc. 86 Mem. at 5.)

CyberLynk's FTP service was integral and critical to WeR1's business in developing Zodiac Island. (Doc. 86 Mem. at 5; Doc. 104, ¶ 14.) However, WeR1 was under no obligation to enter into a contract with CyberLynk. (Doc. 84 Statement ¶ 31.) Some of the independent contractors assisting with the development or creation of Zodiac Island uploaded their work directly to the CyberLynk system.

Jewson was an employee of CyberLynk from August 8, 2006, to February 27, 2009. (Doc. 86 Mem. at 6; Doc. 113 at 20.) As part of his employment, Jewson was provided with the password WeR1 used to access data on CyberLynk's system. (Doc. 86 Mem. at

10

6.) Jewson obtained WeR1's login name and password from Wang or from WeR1's initial sign-up information at CyberLynk. (Doc. 104, ¶ 18; Doc. 118, ¶ 18.[5])

On February 27, 2009, CyberLynk ended Jewson's employment. (Doc. 86 Mem. at 6; Doc. 113 at 20.) Jewson's computer access as an administrator at CyberLynk was terminated at that time. (Doc. 104, ¶ 23; Doc. 110, ¶ 7.) On or about March 26, 2009, Jewson deleted files from WeR1's account with CyberLynk without authority or permission. (Doc. 84 Statement ¶ 8; Doc. 86 Mem. at 7.) He accessed certain CyberLynk customer accounts and deleted WeR1 and other customers' data being stored on CyberLynk's servers. (Doc. 86 Mem. at 6; Doc. 104, ¶ 23; Doc. 113 at 21.) Jewson logged into WeR1's account as if he were an employee of WeR1 using WeR1's password. (Doc. 104, ¶ 23; Doc. 118, ¶ 18; Doc. 110, ¶¶ 3, 7.)

When Jewson deleted WeR1's files, WeR1 had approximately 300 gigabytes of data that had been uploaded to CyberLynk's system. (Doc. 86 Mem. at 7.) CyberLynk was unable to recover any of WeR1's data deleted by Jewson. (*Id.*) Through collection of hard drives from around the world, traveling to other countries to contact vendors, and searching through boxes of paper materials, WeR1 was able to recover over three-quarters of its data. (*Id.* at 8.) However, some of the data was unrecoverable. (*Id.*) WeR1 expended resources to recover its data. (*Id.*)

On March 24, 2011, WeR1 filed this lawsuit in the United States District Court for the District of Hawaii. CyberLynk disputed that Hawaii was the proper venue, and the

---

[5]The parties discuss whether client initial passwords for a control panel were given to Jewson or whether customers gave Jewson passwords if they called for assistance from CyberLynk, and CyberLynk argues that WeR1 could have prevented Jewson's access by changing its password. (*See* Doc. 86 Mem. at 18; Doc. 104, ¶¶ 18-19.) However, the means by which Jewson obtained WeR1's password is immaterial for present purposes.

11

district court in Hawaii transferred the case to this court. CyberLynk filed a counterclaim against WeR1 alleging that WeR1 breached the contract between the parties by filing the case in Hawaii, misrepresenting to CyberLynk that it had read and agreed to the terms of the FTP Agreement, and failing to back up its data. The only damages alleged by CyberLynk are its attorneys' fees in defending this action against WeR1 in the District of Hawaii. (Doc. 104, ¶ 37.)

DISCUSSION

The complaint asserts two state-law claims against CyberLynk: breach of contract and negligence. The parties submit that Wisconsin substantive law is applicable; accordingly, the court will apply Wisconsin law. *See Erie R.R. Co. v. Thompkins*, 304 U.S. 64, 78 (1938). State substantive law must be construed as enacted by the state legislature and as interpreted or declared by the state's highest court. *See Home Valu, Inc. v. Pep Boys – Manny, Moe and Jack of Del., Inc.*, 213 F.3d 960, 963 (7th Cir. 2000); *see also Erie R.R. Co.*, 304 U.S. at 78-79. If, in this case, the Wisconsin Supreme Court has not spoken on the issue and the law is unclear, the court must predict how the state supreme court would decide the questions presented. *Rodman Indus., Inc. v. G & S Mill, Inc.*, 145 F.3d 940, 942 (7th Cir. 1998). In these instances, decisions of the state's intermediate appellate courts are authoritative unless they are split or "there is a compelling reason to doubt that the courts have got the law right." *Rekhi v. Wildwood Indus., Inc.*, 61 F.3d 1313, 1319 (7th Cir. 1995), *quoted in Home Valu, Inc.*, 213 F.3d at 963

CyberLynk calls its FTP Agreement a "clickwrap," which is an agreement on an Internet webpage that requires a user to consent to the terms or conditions by clicking a

box to proceed. *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007)[6]; *accord Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1255 (10th Cir. 2012) (citing *Feldman*), *cert. denied*, *Hancock v. AT&T, Inc.*, 133 S. Ct. 2009 (2013); *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 22 n.4 (2d Cir. 2002). "Clickwrap agreements are increasingly common and have routinely been upheld." *Hancock*, 701 F.3d at 1256 (internal quotation marks omitted). "Even though they are electronic, clickwrap agreements are considered to be writings because they are printable and storable." *Feldman*, 513 F. Supp. 2d at 236. To determine whether a clickwrap agreement is enforceable, courts apply traditional contract-law principles and focus on whether the customer had reasonable notice of and manifested assent to the clickwrap agreement. *Id.* Though many people may not read all of the terms of a clickwrap agreement, as with any written contract, a failure to read the contract does not excuse compliance with its terms. *Id.*; *see Specht*, 306 F.3d at 30. Typically, clickwrap agreements are evaluated in light of state-law contract principles. *Hancock*, 701 F.3d at 1256.

WeR1 and CyberLynk do not dispute that Internet clickwrap agreements can be enforceable. Instead, they are at odds as to whether WeR1 agreed to one when signing up for CyberLynk's service. Generally, courts assess "whether a clickwrap agreement's terms were clearly presented to the consumer, the consumer had an opportunity to read the agreement, and the consumer manifested an unambiguous acceptance of the terms." *Hancock*, 701 F.3d at 1256. A consumer's click of a download button "does not communicate assent to contractual terms if the offer did not make clear to the consumer

---

[6]*Feldman* contrasts a clickwrap agreement from a "browsewrap" agreement, which allows the user to view the terms, such as through a link to the terms, but does not require the user to take any affirmative action before the website performs its end of the contract. *Id.* at 236 n.1.

13

that clicking on the download button would signify assent to those terms." *Specht*, 306 F.3d at 29.

Here, there is a genuine dispute of material fact as to all claims at issue. Taking the facts in WeR1's favor respecting CyberLynk's motion for summary judgment, no FTP Agreement was on CyberLynk's website or through a link on CyberLynk's website when WeR1 was registering for hosting services. Yaged, a savvy computer person, did not see any FTP Agreement terms or a link to any such terms during the registration process. Nor did he see any provisions limiting CyberLynk's liability or exposure to damages. Yaged stated that it was not apparent to him where an FTP Agreement may have been, "if it were there," even though he found such an agreement two years later when he looked at the CyberLynk website. He "knew" he had not seen an FTP Agreement in 2008 a provision absolving CyberLynk from liability. (*See* Doc. 84 Zales Decl. Ex. A at 51-52.) Moreover, Yaged did not believe there was any agreement to which he was giving his assent. (*Id.* at 52.) When asked if he was saying there was no written contract or agreement with CyberLynk for FTP services, Yaged answered: "That's what I'm saying, yes." (*Id.* at 55-56.) Yaged added that he was able to enter an agreement with CyberLynk with no written contract. (*Id.* at 58.) Although Yaged acknowledged that he did not read the terms and conditions of any of the several websites he researched, his testimony at deposition was not just that he failed to read such provisions on CyberLynk's website, but that he did not see such a provision or link. This creates a jury question.

That CyberLynk cannot produce a saved or hard copy of the FTP Agreement as it may have existed in April 2008 confirms the existence of a jury question. Further, Hobach swore in a declaration (before this case was transferred from Hawaii) that the August 2008

14

FTP form was "identical" to the FTP Agreement of April 2008 except for an update to the date at the top. (Doc. 7 Hobach Decl. ¶ 6.) However, he later backtracked and stated that the August 2008 FTP form differed in two ways from the April 2008 FTP Agreement. (Doc. 84 Hobach Aff. ¶¶ 5-6.) This revision of sworn statements suggests a problem with personal knowledge of changes to the website contents and an issue of credibility that a jury should assess.

CyberLynk argues that if WeR1's position is accepted, no meeting of the minds occurred. But the court disagrees. A valid contract requires an offer, an acceptance, and consideration, to demonstrate a meeting of the minds. *Briggs v. Miller*, 176 Wis. 321, 186 N.W. 163, 164 (1922); *Am. Nat'l Prop. & Cas. Co. v. Nersesian*, 2004 WI App 215, ¶ 16, 277 Wis. 2d 430, ¶ 16, 689 N.W.2d 922, ¶ 16. But the meeting of the minds concerns "the essential contents of the contract," *Laney v. Ricardo*, 169 Wis. 267, 172 N.W. 141, 142 (1919); *Ziolkowski Patent Sol'ns Group, S.C. v. Great Lakes Dart Mfg., Inc.*, 2011 WI App 11, ¶ 13, 331 Wis. 2d 230, ¶ 13, 794 N.W.2d 253, ¶ 13; *see Colfax Envelope Corp. v. Local No. 458-3M, Chi. Graphic Commc'ns Int'l Union*, 20 F.3d 750, 752 (7th Cir. 1994) ("Most contract disputes arise because the parties did not foresee and provide for some contingency that has now materialized—so there was no meeting of minds on the matter at issue—yet such disputes are treated as disputes over contractual meaning, not as grounds for rescinding the contract . . . ."). In *Laney*, for instance, the Supreme Court of Wisconsin found that no valid contract existed because the parties never agreed to a price for an option on real estate and whether a warranty was given. 172 N.W. at 142-43. Here, taking the facts in WeR1's favor, there is insufficient evidence that CyberLynk offered or intended to offer the terms of limited liability and assumption of risk regarding backups.

Moreover, a reasonable jury could find that provisions for limitation of liability and assumption of risk by the customer were not essential terms for this contract. A reasonable jury could conclude that the parties agreed to exchange money for storage space on CyberLynk's server.

The lack of a limitation on liability affects the summary judgment motion regarding the negligence claim as well as the contract claim. Thus, CyberLynk's motion must be denied.

Second, taking the facts in CyberLynk's favor on WeR1's motion for partial summary judgment, the FTP Agreement existed on the CyberLynk website in April 2008 when Yaged set up WeR1's account with CyberLynk. At that time, the FTP Agreement contained all of the terms of the August 2008 FTP form minus the two immaterial changes that were made in August 2008. According to two experts, every internet service provider they knew of in 2008 had terms and conditions that limited the liability of internet service providers, and many had terms and conditions that notified a customer that the customer had to keep backups. Hence, a reasonable jury could determine that it was likely that CyberLynk had such terms and conditions in its FTP Agreement also and that those terms and conditions existing in April 2008 for CyberLynk were essentially as set forth in the August 2008 FTP form.

Further, the FTP Agreement was not hidden from Yaged; instead, he was alerted to it by a warning directly above the button on the last page of registration that said clicking the button meant acceptance of the terms of the FTP Agreement. The text of the FTP Agreement was easily found and accessed through a link directly above the warning and final button.

16

Yaged did not read the terms and conditions of any of the several FTP providers he researched because such terms and conditions were unimportant to him. The terms and conditions were on CyberLynk's website, too, but he did not care about them. That Yaged does not recall seeing the terms of the FTP Agreement on CyberLynk's website means little—he was not looking for them or he simply ignored them.

WeR1 contends that even if CyberLynk's FTP Agreement was on the website and Yaged accepted its terms, the limitation of liability and assumption of risk provisions are unconscionable. Unconscionability means the absence of meaningful choice on the part of one party together with contract terms that are unreasonably favorable to the other party. *Wis. Auto Title Loans, Inc. v. Jones*, 2006 WI 53, ¶ 32, 290 Wis. 2d 514, ¶ 32, 714 N.W.2d 155, ¶ 32. The party seeking to invalidate a contract or contract provision bears the burden of proving unconscionability. *Id.*, ¶ 30.

For a contract or contract provision to be declared invalid on this basis, it must be procedurally and substantively unconscionable. *Id.*, ¶ 29. The court weighs these two types of unconscionability; the more substantive unconscionability is present the less procedural unconscionability is required, and vice versa. *Id.*, ¶ 33. But each type must exist. *Id.* For procedural unconscionability the court examines factors bearing on the formation of the contract, including age, education, intelligence, business acumen and experience of the parties; the relative bargaining power of the parties; who drafted the contract; whether the contract terms were explained to the weaker party; whether alterations in the printed terms would have been permitted; and whether there were alternative providers of the subject matter of the contract. *Id.*, ¶ 34. Substantive unconscionability concerns whether the terms of the contract are unreasonably favorable

17

to the more powerful party. *Id.*, ¶ 36. The court looks at the contract terms and determines whether they are commercially reasonable, i.e., whether they lie outside the limits of what is reasonable or acceptable. *Id.*

Here, taking the facts in CyberLynk's favor, no procedural unconscionability exists. WeR1 has failed to establish that the age, education, intelligence, business acumen and experience of the parties are unequal. CyberLynk has six employees. On the other hand, WeR1's size is not known. It has at least Wang and Yaged and offices or contractors or affiliates around the world. Hence, it does not appear to be substantially smaller than CyberLynk.

Though Yaged may not be an attorney or have contracting experience, WeR1 has failed to show that Hobach or anyone at CyberLynk was an attorney or had contracting experience. Yaged was highly educated and had substantial business and technological acumen. Though no one at CyberLynk explained the terms of the FTP Agreement to Yaged, he was an intelligent person and the pertinent language for this case was not written in legalese. Thus, taking the evidence in CyberLynk's favor, the link and warning regarding the FTP Agreement were understandable and appeared on CyberLynk's website above the final registration button, alerting Yaged to the terms and conditions of the contract. The link and text of the FTP Agreement were not hidden, and Yaged did not have to navigate a series of pages to find them; instead, they were available to him with one "click." Again, that Yaged did not notice the link or warning means little, as he did not care about the terms and conditions of the FTP Hosting Service Agreement.

CyberLynk drafted the FTP Agreement and it appears to have been a standardized contract whether alterations would have been permitted is unknown. Although

18

standardized form contracts may indicate inequality of bargaining power, ordinarily they are valid, they are common and they allow for savings in transaction costs. *Id.*, ¶ 53. Here, no high-pressure tactics were used. Further, alternative service providers existed. Yaged said he looked at about twenty providers before choosing CyberLynk. Though the other providers had similar provisions limiting liability or requiring backups, it is unclear whether the provisions were as limiting as CyberLynk's.

In sum, taking the facts in CyberLynk's favor, the court cannot rule as a matter of law that the FTP Agreement was procedurally unfair. And because a reasonable fact-finder could conclude no procedural unfairness existed, the court need not address substantive unconscionability at this time.

As for WeR1's attack on CyberLynk's counterclaim, even if the FTP Agreement binds the parties in this case (taking the facts in CyberLynk's favor), WeR1 has not persuaded the court that Wisconsin law does not permit a claim for breach of a forum selection clause. The parties have not adequately discussed whether Wisconsin law permits recovery of attorney's fees for filing a case in violation of a forum selection clause. Limited research by the court suggests that such attorney's fees would not be recoverable in Illinois or Georgia. *See Fednav Int'l, Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 838-40 (7th Cir. 2010); *Tri-County Towing & Recovery v. BellSouth Adver. & Publ'g Corp.*, No. 1:10-CV-517-RWS, 2011 WL 1497384, at *5 (N.D. Ga. Apr. 19, 2011). But courts in New York have gone both ways under that state's law. *See Brown Rudnick, LLP v. Surgical Orthomedics, Inc.*, No. 13-CV-4348 (JMF), 2014 WL 3439620, at *13-*14 (S.D.N.Y. July 15, 2014) (finding that a party cannot recover attorney's fees as damages for breach of a forum selection clause but noting that two other courts applying New York law had found

19

to the contrary). Consequently, WeR1 has not persuaded the court that the counterclaim must be dismissed.

For these reasons, CyberLynk's motion for summary judgment (Doc. 84) and WeR1's motion for partial summary judgment (Doc. 86) have been denied.

Dated at Milwaukee, Wisconsin, this 31st day of October, 2014.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE